2005-NMCA-106

118 P.3d 740

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Leslie KERBY, Defendant–Appellant.**

**No. 24,350.**

Court of Appeals of New Mexico.

June 20, 2005.

Certiorari Granted, No. 29,336, Aug. 12, 2005.

Patricia A. Madrid, Attorney General, Santa Fe, NM, M. Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Appellee.

Victor A. Titus, Titus & Murphy Law Firm, Farmington, NM, for Appellant.

## OPINION

ALARID, Judge.

{1} Defendant, Leslie Kerby, appeals from the judgment and sentence of the district court convicting him of three counts of criminal sexual contact of a minor. We reverse, holding that the district court improperly admitted evidence of prior bad acts.

## BACKGROUND

{2} On March 28, 2002, Defendant was charged in a criminal information with thirteen counts of criminal contact with a minor. Each count alleged that "on or about or between December 1986 and December 1987," Defendant

> [did] unlawfully and intentionally touch or apply force to the intimate parts of [Victim] or unlawfully and intentionally caused [Victim] to touch [D]efendant's intimate parts and [Victim] was a child under thirteen (13) years of age, contrary to NMSA 1978, § 30–09–13(A)(1) (a 3rd degree felony).

{3} Defendant's case was tried before a jury on April 16–17, 2003. In its case in chief, the State called three witnesses: Sandy Williams, Defendant's former wife and the mother of Victim; Victim; and Henry Katz, Williams' former husband and the father of Victim.

{4} Williams testified that she had known Defendant since junior high school. She and her two daughters moved into a house trailer located on an orchard owned by Defendant's family. They lived in the trailer with Defendant for several months. In late June 1986, Williams and Defendant married. Victim, who was born on June 22, 1980, had just turned six years old. About a month after Williams and Defendant married, Victim told Williams that Defendant had "tickled" her. From Victim's sad, upset demeanor and her gestures toward the lower part of her body, Williams understood Victim to be telling her

that Defendant had touched her inappropriately. Williams confronted Defendant, who denied the accusation. About a month later, Victim once again reported to Williams that Defendant had touched her. Defendant again denied Victim's accusation. In the fall of 1986, the family moved into a newly constructed house located on the orchard property. One night Victim came into Williams' bedroom to tell her that Defendant had come into Victim's room and touched her. Williams and Defendant discussed the incident the next morning. Defendant apologized and promised that this wouldn't happen anymore. A pattern of complaints by Victim and confrontations between Williams and Defendant, followed by apologies by Defendant, continued through 1987. Williams recalled confronting Defendant thirteen to fifteen times. Williams moved out with the children in the summer of 1988. Williams and Defendant were divorced in May 1989. In February 2002, Williams contacted the police about the incidents of inappropriate touching.

{5} Williams conceded that although Defendant would apologize when she confronted him, he never flatly admitted touching Victim inappropriately. Williams also conceded that she never observed Defendant touching her daughters inappropriately.

{6} Victim was the second witness called by the State. She was twenty-two years old at the time of the trial. She recalled that Defendant touched her two times while the family was living in the trailer. She testified that the first time Defendant touched her was directly on her vulva. The other touchings consisted of Defendant rubbing her buttocks over her clothes. Victim recalled that even though she was a child at the time, she recognized that it was not a fatherly touch. Victim clearly recalled four instances of buttock rubbing and had what she described as mental "clips" of other incidents.

{7} Henry Katz was the third, and final, witness called by the State in its case in chief. Katz recalled that in 1989 he had angrily confronted Defendant about Defendant's abuse of Victim as reported to him by Williams. Katz recalled that Defendant was silent at first, but then said he was sorry and

that he had spoken to an elder at church who told Defendant he was forgiven.

{8} Following the close of the State's case in chief, the district court dismissed nine of the thirteen counts in view of Victim's testimony that she had a clear memory of only four of the incidents. The district court allowed the State to amend the complaint to allege that the touchings occurred between June 1, 1986, and December 31, 1987.

{9} Defendant's case in chief consisted of one witness: Defendant's eighty-year-old mother, Evelyn Kerby. Mrs. Kerby testified that she never observed Defendant engage in any inappropriate conduct toward Victim. Mrs. Kerby testified that when she asked Defendant about the accusations of improper touching, Defendant responded that all he had done was pat Victim goodnight. Mrs. Kerby testified that she patted her own children on the bottom and did not think that it was a crime.

{10} The State called three rebuttal witness. Williams testified that there was a small compartment near the fireplace in the master bedroom. Williams recalled that on several occasions when she walked into the bedroom, she saw Defendant coming out of the compartment. She could not understand why he would be in the compartment since they did not store anything in it.

{11} Williams was aware that Defendant had been having Victim bathe when Williams was out of the house. Williams considered this out of the normal routine and instructed Victim to lock the bathroom door and undress in the bathroom.

{12} On one occasion, Williams' fourteen-year-old sister, who was visiting, got up to go to the bathroom. Defendant went into the master bedroom. Williams followed Defendant into the bedroom, where she observed Defendant in the compartment. Later, Williams inspected the compartment and discovered a small hole drilled through a two-by-four inside the compartment. As a test, Williams had one of her daughters stand in the bathtub. Through the peephole Williams could see her daughter in the bathtub. Williams plugged the peep hole with toothpaste. After Williams discovered the peep-

hole, "it all came together." When Williams confronted Defendant, accusing him of peeping at Victim, Defendant acted angry and frustrated and said that he was sorry and that it would not happen again.

{13} On cross-examination, Williams conceded that she had never actually caught Defendant spying on Victim.

{14} The State also called Dick Otero in rebuttal. Otero testified as an expert on carpentry and residential contracting. Otero testified that he had examined the compartment and bathroom in April 2003. He testified that a mirrored medicine cabinet in the bathroom was installed upside down. When the medicine cabinet was removed, Otero observed a second, slightly higher set of pre-existing screw-holes in the bathroom wall. With the cabinet turned right side up, the mounting holes in the back of the chest pre-drilled by the manufacturer matched the second, higher set of screw-holes in the bathroom wall. Moreover, with the medicine chest mounted right side up using the second set of screw holes, a small, crudely punched hole in a metal lip on the bottom of the medicine chest overlapped a small opening cut into the wall of the bathroom, allowing a person in the compartment to observe the inside of the bathroom.

{15} The State's final rebuttal witness was Detective Lisa Haws. Detective Haws testified that she had examined the compartment and the bathroom of Defendant's home in April 2003. Haws confirmed that it was possible to see into the bathroom from the compartment.

{16} The district court submitted four counts of criminal sexual contact with a minor to the jury. The jury acquitted Defendant of one count (the alleged touching of Victim's vulva) and convicted Defendant on the remaining three counts.

## DISCUSSION

### Sufficiency of the Evidence

{17} The crucial issue in this case was the unlawfulness of the alleged touchings. The jury was instructed as follows:

In addition to the other elements of Criminal Sexual Contact of a Minor, as charged in Counts 1 through 4, the state must prove beyond a reasonable doubt that the act was unlawful.

For the act to have been unlawful it must have been done with the intent to arouse or gratify sexual desire or to intrude upon the bodily integrity or personal safety of [Victim]. Criminal Sexual Contact does not include a touching for purposes of reasonable medical treatment, nonabusive parental or custodial care or a lawful search.

Defendant argues that the evidence was insufficient to establish anything more than an innocent patting of a child's bottom.

{18} The standard of review for sufficiency-of-the-evidence claims in criminal cases is well established:

[W]e review the record, marshaling all evidence favorable to [the] trial court's findings. If evidence is in conflict, or credibility is at issue, we accept any interpretation of the evidence that supports the trial court's findings, provided that such a view of the evidence is not inherently improbable. We determine whether the evidence supports any conceivable set of rational deductions and inferences that logically leads to the finding in question. We must be satisfied that the evidence was sufficient to establish the facts essential to conviction with the level of certainty required by the applicable burden of proof. To support a conviction under a beyond a reasonable doubt standard, the evidence and inferences drawn from that evidence must be sufficiently compelling so that a hypothetical reasonable factfinder could have reached a subjective state of near certitude of the guilt of the accused.

*State v. Wynn*, 2001–NMCA–020, ¶ 5, 130 N.M. 381, 24 P.3d 816 (internal citations and quotation marks omitted).

{19} We agree with the State that Defendant's convictions are supported by substantial evidence of unlawfulness. Victim testified that the touchings were not fatherly pattings. Williams testified that the touchings left Victim upset and sad. Williams testified that when she confronted Defendant, he apologized. In common usage, an apology is understood to mean both an ex-

pression of regret and an implicit admission of guilt or fault. Evidence that Defendant apologized when confronted with accusations of improper sexual contact with Victim was probative of Defendant's awareness that his conduct toward Victim was improper. Katz testified that when he confronted Defendant about molesting Victim, Defendant said that he had been forgiven. A jury could have inferred from Defendant's desire for forgiveness for his treatment of Victim that Defendant was conscious that he had acted improperly toward Victim. Lastly, the peephole evidence strongly suggested that Defendant had a voyeuristic interest in Victim.

### Improper Admission of Peephole Evidence

{20} Defendant argues that the peephole evidence was improperly admitted. We agree.

{21} Prior to trial, the district court ruled that the peephole evidence would not be admissible unless the State first established that Defendant had used the peephole to observe Victim as she bathed. The district court further ruled that "[i]f the Defendant presents evidence in which touching of the alleged victim is admitted but indicates that it was not being done for sexual gratification, then the door will be opened regarding evidence of the Defendant touching of other prepubescent girls for the purpose of sexual gratification." On April 15, 2003, Defendant filed a motion asking the district court to reconsider its ruling on the admission of the peephole evidence. Defendant reviewed cases construing Rule 11–404(B) NMRA. Defendant argued that it was the State's burden to establish that he acted unlawfully and that he could not open the door to propensity evidence merely by contesting the State's claim that his touching of Victim was unlawful.

{22} Prior to putting on its rebuttal evidence, the State argued that it should be allowed to rebut Mrs. Kerby's testimony suggesting that Defendant had innocently patted Victim's bottom. The State argued that the jury should hear evidence from other alleged victims recounting Defendant's improper behavior toward them. The district court and

counsel engaged in an extended discussion of case law addressing the use of evidence of other acts pursuant to Rule 11–404(B). The district court refused to allow the State to introduce the evidence of Defendant's behavior toward other alleged victims. The State then argued that Defendant had opened the door to evidence concerning the peephole. The district court ruled that the State could put on evidence of the peephole. As previously noted, the State called three witnesses, who testified in considerable detail about the peephole.

{23} We begin our analysis with Rule 11–404(A), which precludes the admission of evidence of a person's character or a trait of character to prove "action in conformity therewith on a particular occasion." This type of evidence is commonly referred to as "propensity evidence." *E.g., State v. Lamure,* 115 N.M. 61, 69, 846 P.2d 1070, 1078 (Ct.App.1992) (Hartz, J., specially concurring).

{24} The first sentence of Rule 11–404(B) restates Rule 11–404(A)'s proscription of propensity evidence. In applying the second sentence of Rule 11–404(B), it is essential to recognize that the prohibition against propensity evidence set out in Rule 11–404(A) and in the first sentence of Rule 11–404(B) remains operative even when evidence of other acts is being admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." The second sentence of Rule 11–404(B) is not a list of issues excepted from Rule 11–404's general proscription against propensity evidence; rather, issues such as "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake" are merely examples of issues as to which evidence of other acts can be relevant without reliance upon an impermissible inference of "the character of a person in order to show action in conformity therewith." Rule 11–404(B).

{25} Under Rule 11–404(B), the proponent of evidence of other acts must identify the particular consequential fact upon which the proffered evidence bears and must explain how the proffered evidence

makes the consequential fact "more probable or less probable," Rule 11–401 NMRA, *in a way that does not depend upon an inference of a propensity for criminal behavior. State v. Jones,* 120 N.M. 185, 187, 899 P.2d 1139, 1141 (Ct.App.1995). Even when it is shown that evidence of other acts has a legitimate alternative use that does not depend upon an inference of propensity, the proponent must establish that under Rule 11–403 NMRA, the probative value of the evidence used for a legitimate, non-propensity purpose outweighs any unfair prejudice to the defendant. *State v. Ruiz,* 2001–NMCA–097, ¶ 15, 131 N.M. 241, 34 P.3d 630. In the case of evidence of other uncharged bad acts, unfair prejudice refers to the risk that the jury, notwithstanding limiting instructions, *see* Rule 11–105 NMRA, nevertheless will draw unfavorable inferences about the defendant's propensity for criminal conduct from evidence of non-charged bad acts, 1 Kenneth S. Broun, et al., *McCormick on Evidence* § 190, at 672 (John W. Strong et al. eds., 5th ed.1999) (observing that "the fact that there is an accepted logical basis for the evidence other than the forbidden one of showing a proclivity for criminality does not preclude the jury from relying on a defendant's apparent propensity toward criminal behavior"); *Old Chief v. United States,* 519 U.S. 172, 180–81, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (discussing "unfair prejudice" in the context of Fed. Rule Evid. 404(b); observing that it is improper to generalize a defendant's uncharged bad act into bad character and to infer that bad character raises the odds that the defendant did the later bad act now charged). Evidence of uncharged bad acts also may unfairly prejudice a defendant by emotionally predisposing the jury against the defendant. Margaret C. Livnah, *Branding the Sexual Predator: Constitutional Ramifications of Federal Rules of Evidence 413 Through 415,* 44 Clev. St. L.Rev. 169, 181–82 (1996).

{26} Prior to the adoption of the Rules of Evidence, we upheld the admission of evidence of uncharged sexual conduct toward the prosecuting witness under the common-law "lewd and lascivious disposition" exception to the rule against character evidence. *E.g., State v. Minns,* 80 N.M. 269, 272, 454 P.2d 355, 358 (Ct.App.1969). Subsequently, in *State v. Scott,* a case decided after the adoption of Rule 11–404(B), we relied upon *Minns* as support for the proposition that evidence of prior similar acts toward the victim, " 'if not too remote, is admissible as showing a lewd and lascivious disposition ... toward the prosecuting witness and as corroborating evidence.' " 113 N.M. 525, 528, 828 P.2d 958, 961 (Ct.App.1991) (quoting *Minns,* 80 N.M. at 272, 454 P.2d at 358). In *State v. Landers,* 115 N.M. 514, 519, 853 P.2d 1270, 1275 (Ct.App.1992), this Court considered and rejected the argument that the exception for evidence of a lewd and lascivious disposition toward the prosecuting witness was inconsistent with Rule 11–404(B). We held that the trial court did not abuse its discretion in admitting evidence of incidents of uncharged sex misconduct that "corroborated the victim's testimony and placed the charged acts in context." *Id.* at 520, 853 P.2d at 1276. Unfortunately, we did not critically examine how the evidence of uncharged acts would have tended to corroborate the victim's testimony or place the charged acts in context other than through an inference of the defendant's propensity for improper sexual conduct towards the victim. In *State v. Sandate,* 119 N.M. 235, 242–43, 889 P.2d 843, 850–51 (Ct.App.1994), the defendant urged this Court to reconsider *Landers.* We declined to reach the issue because the evidence in question was inadmissible on other grounds. We noted in passing that "[t]he rationale underlying *Landers* may very well require reconsideration." *Id.* at 243, 889 P.2d at 851 (citing *State v. Williams,* 117 N.M. 551, 561–62, 874 P.2d 12, 22–23 (1994) (Montgomery, C.J., specially concurring)). Our most recent reported decision relying on the *Landers* exception is *State v. Casaus,* 1996–NMCA–031, ¶ 25, 121 N.M. 481, 913 P.2d 669. Although our Supreme Court has noted the exception for prior sexual conduct with the prosecuting witness, *Williams,* 117 N.M. at 558–59, 874 P.2d at 19–20, to our knowledge, our Supreme Court has not applied this exception in a case decided after the adoption of Rule 11–404.

{27} A leading commentator has described the relationship between Federal Rule of Evidence 404(b) (and its state counterparts) and

the use of uncharged misconduct evidence in prosecutions for sex crimes:

> The overwhelming majority of the cases recognizing the special exceptions [for evidence of uncharged sexual misconduct] antedate the Federal Rules. Several commentators assert that it is questionable whether the special exceptions survived the adoption of the rules. To say that the exceptions' survival is questionable is probably an understatement. It is exceedingly difficult to reconcile the exceptions [for evidence of uncharged sexual misconduct] with the clear language of Rule 404(b). The exception seems at odds with the prohibition in the first sentence of Rule 404(b).

1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 4:18 (rev.ed., 2005). This same commentator has suggested that "[t]he exceptions' existence may indeed reflect Victorian prejudices and emotion rather than logical and scientific fact." *Id.* There is an extensive body of scholarly articles examining the historical and logical grounds for admitting evidence of uncharged misconduct in sex offender cases. *E.g.*, Thomas J. Reed, *Reading Gaol Revisited: Admission of Uncharged Misconduct Evidence in Sex Offender Cases*, 21 Am. J.Crim. L. 127 (1993). Scholarly debate over the admission of evidence of uncharged sexual misconduct was reinvigorated by Congress' consideration, and ultimate passage, of legislation amending the Federal Rules of Evidence to liberalize the admission of evidence of uncharged sexual misconduct. *E.g.*, James Joseph Duane, *The New Federal Rules of Evidence on Prior Acts of Accused Sex Offenders: A Poorly Drafted Version of a Very Bad Idea*, 157 F.R.D. 95 (1994); 23 Charles Alan Wright and Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5411 (Supp.2005).

{28} We find it exceedingly difficult to reconcile the *Landers* exception for evidence of a lewd and lascivious disposition toward the prosecuting witness with Rule 11–404. In the related context of evidence of uncharged sexual misconduct with victims other than the prosecuting witness, we have acknowledged that "the 'lewd disposition' exception is nothing more than a euphemism

for the character evidence which Federal Rule of Evidence 404(b) and its state counterparts are designed to exclude." *State v. Lucero*, 114 N.M. 489, 492–93, 840 P.2d 1255, 1258–59 (Ct.App.1992). Nothing in the express language of Rule 11–404 mandates the perpetuation of a common-law exception to the general proscription of propensity evidence; to the contrary, the lewd and lascivious disposition exception appears to flatly contradict the general proscription of propensity evidence found in Rule 11–404(A) and repeated in the first sentence of Rule 11–404(B). *See Lucero*, 114 N.M. at 492–93, 840 P.2d at 1258–59 (rejecting lewd-and-lascivious-disposition exception for evidence of uncharged conduct with other victims). In the present case, the peephole was relevant to the issue of sexual gratification precisely because it allowed the jury to infer that sexual attraction to young female children was a trait of Defendant's character: Defendant spied on Victim for sexual gratification and therefore it is more likely that when he touched her, it was also for sexual gratification.

{29} Logical consistency requires that we extend *Lucero* to the admission of evidence of uncharged misconduct with the prosecuting witness. We agree with the late Chief Justice Montgomery that the *Landers* exception is "indefensible." *Williams*, 117 N.M. at 562, 874 P.2d at 23 (characterizing the distinction recognized in *Landers* as "indefensible" and its approach as an "anomaly"). "While we may sympathize with the State's desire to improve its position, and while 'we recognize the potential difficulty in prosecuting such cases' involving sex crimes against children, it is equally true that 'the appropriate solution is [not] to wink at the dictates of Rule [11–]404(B).' " *Ruiz*, 2001–NMCA–097, ¶ 19, 131 N.M. 241, 34 P.3d 630 (quoting *Lucero*, 114 N.M. at 494, 840 P.2d at 1260). We hereby disavow *Landers* and its progeny's "indefensible" distinction between evidence of a lewd and lascivious disposition toward the prosecuting witness and evidence of a lewd and lascivious disposition toward other victims. *See First Fin. Trust Co. v. Scott*, 1996–NMSC–065, ¶¶ 16–17, 122 N.M. 572, 929 P.2d 263 (abrogating doctrine of intrastate forum non conveniens; observing

that stare decisis does not preclude an appellate court from overruling "improvident precedent, even recent precedent"). In either case, the exception is nothing more than a euphemism for the propensity evidence that Rule 11–404 was designed to exclude.

{30} Adoption of a sex-crimes-against-children exception to Rule 11–404 is best carried out in the process of rule-making. The decision to adopt an exception to Rule 11–404 will require an extensive examination of legislative facts, see Lee v. Martinez, 2004–NMSC–027, ¶ 13, 136 N.M. 166, 96 P.3d 291 (remanding consolidated cases for evidentiary hearing on whether to repeal Rule 11–707 NMRA; observing that decision to repeal a rule of evidence involves consideration of legislative, as opposed to adjudicative, facts), including studies investigating whether prior sexual misconduct with children is a reliable predictor of subsequent sexual misconduct, Sara Sun Beale, *Prior Similar Acts in Prosecutions for Rape & Child Sex Abuse*, 4 Crim. L.F. 307, 319–21 (1993) (acknowledging that there may be a valid scientific basis for narrowly-tailored exceptions for some forms of child sex abuse justifying the admission of evidence of other bad acts in prosecutions for sex crimes against children).

{31} The State also argues that Defendant "opened the door" to the peephole evidence by offering evidence through Mrs. Kerby suggesting that his touching of Victim was lawful. We disagree.

{32} Defendant had a right to require the State to prove every element of its case, including the unlawfulness of the touchings, beyond a reasonable doubt. UJIs 14–101, 14–132, 14–5061 NMRA. Defendant also had a right to call witnesses to testify in his defense. See Washington v. Texas, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (holding that due process guarantees a criminal defendant the right to present the testimony of defense witnesses). The State's approach to opening the door would require Defendant to elect between enforcing Rule 11–404's proscription of propensity evidence and exercising his right to contest the elements of the State's case. Nothing in Rule 11–404 expressly conditions the exclusion of propensity evidence upon an accused's con-

cession that his conduct was unlawful. The drafters of Rule 11–404 carefully prescribed the circumstances under which evidence of an accused's character is admissible in rebuttal. Rule 11–404(A)(1) (authorizing admission of rebuttal evidence of an accused's character to rebut "[e]vidence of a pertinent trait of character offered by an accused"). We are reluctant to engraft amorphous "opening the door" concepts onto Rule 11–404 when the Rule itself specifically provides a framework for the admission of rebuttal evidence of character. We are satisfied from our review of the transcript that Mrs. Kerby's testimony did not constitute evidence of a pertinent, favorable trait of Defendant's character. Defendant did not forfeit the protection of Rule 11–404 by putting on evidence refuting the State's claim that the touchings were unlawful.

{33} Lastly, we must consider whether the admission of the peephole evidence was harmless. Rule 5–113(A) NMRA. Error in the exclusion or admission of evidence in a criminal trial is not harmless "if there is a reasonable possibility that the excluded evidence might have affected the jury's verdict." State v. Balderama, 2004–NMSC–008, ¶ 41, 135 N.M. 329, 88 P.3d 845. We are persuaded that the peephole evidence very likely substantially contributed to the jury's guilty verdicts. Defendant's state of mind was the crucial issue in the case. Without the peephole evidence, Defendant could have argued with some degree of plausibility that Victim and Williams had simply misunderstood conduct that had occurred years before. However, with the introduction of the peephole evidence, Defendant's behavior in patting Victim becomes much more sinister. We believe that the jury very likely reasoned from the peephole evidence that Defendant was sexually aroused when he secretly spied on Victim and that he was similarly aroused when he patted her. Moreover, evidence that Defendant, who continued to live in the house after Williams and the children moved out, inverted the medicine chest to obscure the peephole would have suggested to the jury Defendant's consciousness of wrongdoing in spying on Victim and other girls.

{34} We reverse Defendant's convictions based on the erroneous admission of the peephole evidence. Because Defendant's convictions were supported by substantial evidence, we remand for retrial. *State v. Rosaire*, 1996–NMCA–115, ¶ 20, 123 N.M. 250, 939 P.2d 597 (observing that retrial is not barred by double jeopardy if the evidence admitted at the first trial, *including any wrongfully admitted evidence,* was sufficient to support the defendant's conviction).

{35} Defendant has also challenged the peephole evidence on the ground that it was obtained by warrantless entries into Defendant's residence in violation of the Fourth Amendment. Our determination that the peephole evidence is inadmissible renders moot this claim of error.

### Statute of Limitations

{36} New Mexico law provides the following:

No person shall be prosecuted, tried or punished in any court of this state unless the indictment is found or information or complaint is filed therefor within the time as provided:

. . . .

B. for a third or fourth degree felony, within five years from the time the crime was committed[.]

NMSA 1978, § 30–1–8(B) (1963, as amended through 1997). As noted above, Defendant was acquitted of the charge of touching Victim's unclothed genital area. The three charges that Defendant faces on remand are for criminal sexual contact of a minor in the third degree, a third degree felony. NMSA 1978, § 30–9–13(C) (1975). These crimes are subject to the five-year limitations period of Section 30–1–8.

{37} In 1987, the Legislature enacted a tolling provision applicable to sex offenses against children:

The applicable time period for commencing prosecution pursuant to Section 30–1–8 NMSA 1978 shall not commence to run for an alleged violation of Section 30–6–1, 30–9–11 or 30–9–13 NMSA 1978 until the victim attains the age of eighteen or the violation is reported to a law enforcement agency, whichever occurs first.

NMSA 1978, § 30–1–9.1 (1987). Section 30–1–9.1 applies only to crimes committed after its effective date. 1987 N.M. Laws, ch. 117, § 2. The State acknowledges that the tolling provision does not apply to any of the alleged touchings that occurred prior to June 19, 1987, the effective date [1] of the tolling provision; accordingly, the statute of limitations expired no later than June 18, 1992, as to any alleged touchings occurring prior to June 19, 1987. As to any touchings occurring on or after June 19, 1987, the five-year limitations period would have been tolled by Section 30–1–8.1 until June 22, 1998, Victim's eighteenth birthday. As to these touchings, there is no limitations problem as the criminal information in this case was filed on March 28, 2002, well within five years of June 22, 1998. Because Defendant did not pursue a statute of limitations defense at trial, the State's evidence and the jury instructions did not distinguish between *pre*-June 19, 1987, touchings, which are time-barred, and *post*-June 19, 1987, touchings, which are still subject to prosecution.

{38} A plea of not guilty puts in issue the statute of limitations. *State v. Oliver,* 71 N.M. 317, 318, 378 P.2d 135, 136 (1963). When the statute of limitations is raised, the State bears the burden of proving beyond a reasonable doubt that the charged offenses were not barred by the statute of limitations. *See id.* (holding that the State failed to come forward with sufficient evidence of circumstances that would have tolled the running of the statute of the limitations and that the trial court should have directed a verdict for the defendant); *see generally* Annotation, *Burden on State to Show that Crime Was Committed Within Limitation Period,* 13 A.L.R. 1446 (1921).

{39} Other than pleading not guilty, Defendant did nothing to raise the bar of the statute of limitations in the district court. Neither defense counsel, the prosecutor, nor

---

**1.** Section 30–1–9.1 took effect ninety days after the adjournment of the session enacting it. N.M. Const. art. IV, § 23. The session of the Legislature that enacted Section 30–1–9.1 adjourned on March 21, 1987. 1987 N.M. Laws, Vol. I, Secretary of State's Certificate of Authentication.

the district court appears to have recognized that the State was prohibited by Section 30–1–8 from prosecuting Defendant for touchings that occurred prior to June 19, 1987. Defendant argues that the statute of limitations is a jurisdictional issue in a criminal case that can be raised for the first time on appeal. The State, analogizing from civil cases, responds that the statute of limitations in a criminal case is merely an affirmative defense that can be forfeited by the defendant's failure to assert it in a timely manner.

{40} We have not discovered a reported New Mexico case deciding whether in a criminal case the bar of the statute of limitations is a jurisdictional limit on the very right of the State to bring a criminal prosecution. A review of opinions from other jurisdictions reveals a substantial divergence of opinion as to the nature of a statute of limitations defense. See generally State v. Timoteo, 87 Hawai'i 108, 952 P.2d 865, 876–78 (1997) (Ramil, J., dissenting) (noting three distinct approaches to waiver of a criminal statute of limitations). According to a leading treatise:

> Three different views are to be found as to the effect of the running of the applicable statute of limitations in a criminal case. One is that once the time has run the court is without jurisdiction to try the offense, which means the defendant need not raise the issue in a pretrial motion and is entitled to relief notwithstanding his otherwise valid plea of guilty or his raising of the issue for the first time on appeal. The second is that this is a matter of affirmative defense which may be waived by either the defendant's failure to raise it in a pretrial motion or the defendant's entry of a guilty plea. The third variation is that the statute of limitations is waivable, but that only an intentional relinquishment of the right will suffice.

4 Wayne R. LaFave et al., Criminal Procedure § 18.5(a) at 722–23 (2d ed.1999) (footnotes omitted).

{41} In view of our determination that Defendant's convictions must be reversed on evidentiary grounds, we need not decide whether the statute of limitations is jurisdictional. Since the case is to be retried, we perceive no compelling reason for denying

Defendant the opportunity to assert Section 30–1–8 on remand. Cf. Kucel v. N.M. Med. Review Comm'n, 2000–NMCA–026, ¶ 18, 128 N.M. 691, 997 P.2d 823 (declining to apply law of the case doctrine; expressing preference for applying "the law of the land-the law as the Legislature wrote it and intended it" as opposed to perpetuating manifest error). On remand Defendant may request that the jury be instructed as to the State's burden of establishing beyond a reasonable doubt that each touching occurred on or after June 19, 1987.

## Speedy Trial

{42} Defendant was arrested on March 10, 2002, and a criminal information was filed on March 28, 2002. Defendant's right to a speedy trial attached upon his arrest. State v. Manzanares, 1996–NMSC–028, ¶ 8, 121 N.M. 798, 918 P.2d 714 (observing that the right to a speedy trial attaches when the defendant is formally charged or when he is arrested and held to answer a criminal charge). Defendant's trial began on April 15, 2003.

{43} Unless the length of delay is "presumptively prejudicial," there is no need to engage in a full-blown analysis of the speedy trial issue. State v. LeFebre, 2001–NMCA–009, ¶ 9, 130 N.M. 130, 19 P.3d 825. Whether the length of the delay is presumptively prejudicial depends upon the relative complexity of the case. Id. We recognize three general categories of complexity: simple, intermediate and complex. LeFebre, 2001–NMCA–009, ¶¶ 10–12, 130 N.M. 130, 19 P.3d 825. Our Supreme Court has observed that nine months is presumptively prejudicial in a simple case; twelve months is presumptively prejudicial in an intermediate case; and, fifteen months is presumptively prejudicial in a complex case. Salandre v. State, 111 N.M. 422, 428, 806 P.2d 562, 568 (1991).

{44} In the present case, the district court found that Defendant's case was a complex case, and therefore that the thirteen-month delay was not presumptively prejudicial. Although we give considerable deference to a district court's determination of the complexity of a case, that deference "is

not without limits." *LeFebre*, 2001–NMCA–009, ¶ 10, 130 N.M. 130, 19 P.3d 825. We cannot accept the district court's conclusion that this was a complex case, representing the *highest* level of complexity for speedy trial purposes. There were no scientific or medical issues in the case. The State's only expert testified about the relatively mundane issue of the installation of the medicine chest and its relationship to the peephole. The State's case largely depended on the credibility of Williams and Victim as judged by their demeanor in front of the jury. We hold that Defendant's case was of no more than intermediate complexity. Therefore, a thirteen-month delay in the present case is presumptively prejudicial. On remand, the district court should proceed to evaluate Defendant's speedy trial claim under the four factors of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**Jury Instruction on Unlawfulness**

{45} As previously noted, the jury was given the following instruction:

In addition to the other elements of Criminal Sexual Contact of a Minor, as charged in Counts 1 through 4, the state must prove beyond a reasonable doubt that the act was unlawful.

For the act to have been unlawful it must have been done with the intent to arouse or gratify sexual desire or to intrude upon the bodily integrity or personal safety of [Victim]. Criminal Sexual Contact does not include a touching for purposes of reasonable medical treatment, nonabusive parental or custodial care or a lawful search.

{46} Defendant argues that the phrase "intrude upon the bodily integrity ... of [Victim]" was confusing and allowed the jury to convict Defendant based upon "a nonsexual event." The State argues that Defendant waived this claim of error. As the State points out, the district court reviewed this instruction in the presence of the prosecutor and defense counsel. The district court specifically asked whether counsel agreed to the inclusion of the language "intrude upon the bodily integrity or personal safety of [Victim]." Both the prosecutor and defense counsel responded, "Yes, your Honor." We agree with the State that Defendant waived this claim of error.

**CONCLUSION**

{47} We vacate the judgment and sentence of the district court and remand for proceedings consistent with this opinion.

{48} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, and CELIA FOY CASTILLO, Judge.